UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTHONY MASTRANGELO, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 01-0582 (TFH) |
| | ) |
| NATIONAL RAILROAD | ) |
| PASSENGER CORPORATION, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Anthony Mastrangelo brought this case against Defendant National Railroad Passenger Corporation ("Amtrak"), claiming wrongful retaliatory discharge under District of Columbia common law.[1]  Pending before the Court is Defendant's Motion for Summary Judgment [# 22].  Upon careful review of the motion, Plaintiff's opposition, Defendant's reply, the parties' oral arguments made at the hearing on the motion, and the entire record herein, the Court will grant the Motion for Summary Judgment.

### I. BACKGROUND

**A.    Factual History**

The undisputed facts are as follows.  See Amtrak's Statement of Undisputed Material Facts; Plaintiff's Counter Statement of Material Facts Genuinely in Dispute.  Plaintiff Anthony Mastrangelo began working for Amtrak in 1972.  4th Am. Compl. ¶ 139.  Plaintiff started at Amtrak as a Ticket Clerk, and eventually was promoted into a managerial position.  4th Am.

---

[1] Plaintiff also alleged age discrimination claims against Defendant, under both the District of Columbia Code and the Age Discrimination in Employment Act.  Plaintiff has since withdrawn these claims.  See Pl.'s Opp'n to Def. Mot. Summ. J. 1.

Compl. ¶ 140.  Plaintiff worked in various managerial positions for the majority of the remainder of his tenure at Amtrak.  Id.  Amtrak notified Plaintiff of his discharge on March 9, 2000, effective March 23, 2000.  4th Am. Compl. ¶ 145; Am. Answer to 4th Am. Compl. ¶ 145.

Plaintiff admits that during the course of his employment at Amtrak, Plaintiff consistently received overall average performance evaluations.  Pl.'s Counter Statement of Material Facts Genuinely in Dispute ¶ 2.  In February of 1999, Amtrak began to implement the "Service Standards Initiative," which was a comprehensive strategy aimed at meeting the mandate Amtrak received from Congress to "use its best business judgment" to minimize the amount of subsidies Amtrak was receiving from the government.  See 49 U.S.C. § 24101(c)(1)(E), (F); Decl. of Anne Hoey in Support of Defendant National Railroad Passenger Corporation's Mot. for Summ. J. ¶¶ 2-3 (Def. Ex. 6).  Amtrak had retained an outside human resources consulting firm, Personnel Decisions International, Inc. ("PDI"), to identify the Amtrak managers best able to improve productivity.  PDI devised a plan to identify the highest performing 90% of managers.  The remaining 10% of management employees would be terminated.  Hoey Decl. ¶ 5 (Def. Ex. 6).

Pursuant to the new performance evaluation system, each manager was given a performance rating by his immediate supervisor, and was also rated by a group made up of the employee himself, his supervisor, and his subordinates.  The numerical rating system required scoring on a scale of one (lowest) to seven (highest).  A rating of one or two was defined as "below competent," a rating of three to five was defined as "competent," and a rating of six or seven was defined as "above competent."  The two scores were combined to give the employee his final score.  Id. ¶¶ 15-18.  At the close of the 1999 fiscal year, Plaintiff was evaluated under the new system.  Id. ¶ 15.

Plaintiff's supervisor evaluation was performed by Henry Weller. Mr. Weller ranked Plaintiff in the "competent" range of the rating scale. Amtrak Job Performance Form for Management Employees for Anthony Mastrangelo (Def. Ex. 10). The scores Mr. Weller gave to Plaintiff were then reviewed and approved by Mr. Weller's own supervisor, Edwin E. Ellis, Jr. Id.

By December 15, 1999, Amtrak had transmitted all of the supervisor performance evaluations to PDI, including the one Mr. Weller completed for Plaintiff. Hoey Decl. ¶ 15. PDI calculated the two basic scores for Plaintiff: his score in the supervisor evaluation was 3.64 and his score in the peer evaluation was 5.28. Amtrak Performance Management Report FY99 for Anthony Mastrangelo at 3 (Def. Ex. 15). PDI then gave Plaintiff a composite score, which weighted the two ratings according to his own supervisory responsibilities. Id. Plaintiff's ultimate score of 4.21 placed him in the bottom ten percent of his management category, making him subject to termination. Id.; Decl. of Edward Walker in Supp. of Amtrak's Mot. for Summ. J. ¶ 4 (Def. Ex. 13).

On or about March 9, 2000, Plaintiff and approximately 150 other management level employees were discharged. Hoey Decl. ¶ 23. As part of his termination package, Plaintiff received a detailed explanation of the appeals process that Amtrak had instituted for the purpose of neutralizing any possible supervisor bias or other errors in the process. Decl. of Linda A. Damiano in Supp. of Amtrak's Mot. for Summ. J. ¶ 6 (Def. Ex. 2). Plaintiff chose not to pursue an appeal. Id.

Plaintiff claims that his performance evaluation was rigged to place him in the bottom ten percent of management employees, thus subjecting him to wrongful termination, in retaliation for

3

his provision of information to Amtrak's Office of the Inspector General ("OIG").

**B.     Procedural History**

The procedural history in this case is quite extensive and has been set forth in the Court's previous opinions.  See the following Byrne v. National Railroad Passenger Corporation, No. 01-0531 opinions: TFH Mem. Op., Aug. 7, 2002; TFH Mem. Op., Oct. 22, 2003.  Therefore, only a brief summary of the pertinent history is presented here.

Plaintiff originally filed this action in the Superior Court of the District of Columbia on March 9, 2001.  On March 21, 2001, the case was removed to this Court pursuant to 28 U.S.C. § 1441, *et seq*.  By Order dated March 18, 2002, the Court consolidated this action with a related case also pending before the Court, Sessoms, et al. v. National Railroad Passenger Corporation, No. 01-0531, pursuant to Federal Rule of Civil Procedure 42(a).  The parties were ordered to file one consolidated complaint within eleven days of that order.  That first Amended Complaint was filed on March 29, 2002.  The complaint has subsequently been amended several times, up to the current Fourth Amended Complaint.

By its Order dated October 22, 2003, the Court granted in part Defendant's motion to strike portions of the Fourth Amended Complaint, striking paragraphs 51, 52, 54, 55, 60, 61, 64, 69, 71, 73, 75, 79, 82, 83, 86, 87, 88, 89, 94, 97, 98, 100, 101, 104, 105, 110, 111, 115, 116, 118, 119, 123, 124, 125, 127, 131, 132, 136, 137, 138, 143, 146, and 147, the second clause of paragraph 63, the second clause of paragraph 67, the second sentence of 113, the portion of paragraph 130 that states "while PERS-16 (March 1, 1988) was in effect," and the portion of paragraph 135 that states "during the period while PERS-16 (March 1, 1988) was in effect." See TFH Order of 10/22/03 (filed 10/22/03).

By Order dated June 10, 2005, the Court ordered that Plaintiff Mastrangelo's case be severed from the consolidated action for separate proceedings, and reinstated under its original Civil Action Number (01-0582).  See TFH Or., June 10, 2005.  The instant motion for summary judgment was filed by Defendant on June 24, 2005.  Plaintiff filed an opposition on July 25, 2005, to which Defendant replied on August 8, 2005.  Oral argument on the motion was heard on October 3, 2005.

## II.  DISCUSSION

### A.  Legal Standard

Amtrak has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  In order for the Court to grant summary judgement under Rule 56, the moving party must demonstrate that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In considering summary judgment, the Court must view all of the evidence in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  As the non-moving party, Plaintiff has the ultimate burden of demonstrating a genuine issue of material fact for trial.  Celotex, 477 U.S. at 324.  Plaintiff's opposition must consist of more than unsupported allegations; rather, it must be supported by affidavits or other competent evidence setting forth specific facts showing there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.  In doing so, Plaintiff "may not rest upon the mere allegations or denials of [her] pleading . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In other words, Plaintiff must present affirmative evidence; "[c]onclusory allegations unsupported by factual data will not create a triable issue of fact."

Exxon Corp. v. FTC., 663 F.2d 120, 127 (D.C. Cir. 1980) (citation omitted). Evidence that is "merely colorable" or "not significantly probative" will not prevent summary judgment. Ross v. Runyon, 859 F. Supp. 15, 18 (D.D.C. 1994), aff'd, 1995 WL 791567 (D.C. Cir. 1995). Plaintiff must come forward with proof that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Bare, unaided claims that a factual controversy persists are insufficient. Alyeska Pipeline Serv. Co. v. United States Envtl. Prot. Agency, 856 F.2d 309, 314 (D.C. Cir. 1988).

**B.    Analysis**

Plaintiff alleges that he was discharged by Amtrak in retaliation for his reports of "certain potentially illegal acts" to the OIG and that his termination was therefore unlawful under District of Columbia common law. 4th Am. Compl ¶ 175-79. As a general rule, the District of Columbia has long recognized the at-will employment doctrine, which holds that "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." Adams v. George W. Cochran & Co., 597 A.2d 28, 30 (D.C. 1991). In Adams, the District of Columbia Court of Appeals first recognized a "very narrow exception" to the at-will doctrine, creating an intentional tort for wrongful discharge where a plaintiff can prove that the "sole reason for the discharge is the employee's refusal to violate law, as expressed in a statute or municipal regulation." Id. at 34.

The D.C. Court of Appeals later clarified, however, that "the 'very narrow exception' created in Adams should not be read in a manner that makes it impossible to recognize any additional public policy exceptions to the at-will doctrine that may warrant recognition." Carl v. Children's Hosp., 702 A.2d 159, 160 (D.C. 1997). Under Carl, the analysis is as follows:

6

> Th[e] court should consider seriously only those arguments that reflect a clear mandate of public policy -- *i.e.*, those that make a clear showing, based on some identifiable policy that has been "officially declared" in a statute or municipal regulation, or in the Constitution, that a new exception is needed. Furthermore, there must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination.

Id. at 164 (Terry, J., concurring) (footnotes omitted); accord Liberatore v. Melville Corp., 168 F.3d 1326 (D.C. Cir. 1999). Since Carl, the tort has been held to encompass claims of discharge in retaliation for whistleblowing. See Liberatore, 168 F.3d 1326; Taylor v. WMATA, 109 F. Supp. 2d 11, 15 (D.D.C. 2000); Fingerhut v. Children's Nat'l Med. Ctr., 738 A.2d 799 (D.C. 1999).

Plaintiff's claim of retaliatory discharge does not fall into the very narrow Adams exception to the at-will doctrine: Plaintiff has not alleged that the sole reason for his discharge was his refusal to violate the law. The Court is aware of no authority, and Plaintiff points to none, that would have imposed a legal duty upon Plaintiff to provide information to the OIG at Amtrak. Plaintiff did not face a "Hobson's choice" between breaking the law or losing his job. See Adams, 597 A.2d at 34. Rather, Plaintiff alleges that his case qualifies as a different public policy exception to the at-will doctrine. Accordingly, his claim must be analyzed under the framework set forth in Carl.

Under Carl, Plaintiff must first identify a policy that has been "officially declared." See Carl, 702 A.2d at 164. Here, Plaintiff points to Title 5, Section 7(c) of Appendix 3, Inspector General Act of 1978, As Amended, which states:

> Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority,

> take or threaten to take, any action against any employee as reprisal for
> making a complaint or disclosing information to an Inspector General,
> unless the complaint made or the information disclosed with the
> knowledge that it was false or with wilful disregard for its truth or falsity.

5 U.S.C. App. 3 § 7.  Plaintiff asserts that this provision evinces a clear mandate of public policy. He further contends that his claim meets the second prong of the Carl analysis, in that the public policy mandated in the Inspector General Act of 1978 has a close nexus to the conduct that forms the basis of Plaintiff's complaint (Amtrak's termination of Plaintiff as reprisal for his disclosure of information to the OIG).  Defendant does not contest either of these assertions here.

      Defendant argues that Plaintiff's claim of wrongful discharge must fail because: (1) Plaintiff has failed to establish a causal connection between his cooperation with the OIG and his termination because the supervisor who submitted the performance evaluation on which Plaintiff's firing was based did not have knowledge of Plaintiff's cooperation until after the evaluation was submitted; and (2) Plaintiff cannot demonstrate that his cooperation with the OIG was the sole reason for his termination.  Both of these arguments can be addressed by the same essential question: has Plaintiff presented evidence sufficient to create a genuine issue of material fact as to causation?

      The Court finds that Plaintiff has not.  Summary judgment is warranted because Plaintiff has failed to provide evidence of the causal link between the alleged retaliation and Plaintiff's termination necessary to sustain a claim of wrongful discharge.  To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in a protected activity; (2) the employer

took an adverse personnel action; and (3) there was a causal connection between the two.[2]  See Taylor v. Washington Metro. Area Transit Auth., 109 F.Supp.2d 11, 17 (D.D.C. 2000) (citing McDonnell Douglas v. Green, 411 U.S. 792 (1973)).  Further, the causal connection between the protected activity and the adverse personnel action must be tight.  In order for Plaintiff's wrongful discharge claim to succeed, Plaintiff must have been terminated solely, or at least substantially, for engaging in the alleged whistleblowing activity.  See Taylor, 109 F. Supp. 2d at 15 n.6.

Defendant contends that in order for Plaintiff to succeed on his claim, "the retaliation must have been the 'sole reason for the discharge.'"  Reply to Pl.'s Opp'n to Amtrak's Mot. Summ. J. 2 (quoting Adams, 597 A.2d at 34).  Defendant claims that despite the expansion of the wrongful discharge tort after Adams, the "sole reason" element remains.  Defendant is correct that the "sole reason" requirement remains in an Adams situation, where the plaintiff claims to have been discharged based on his refusal to violate the law.  See, e.g., Mandsager v. Jaquith, 706 A.2d 39, 41 n. 5 (D.C. 1998).  As stated earlier, however, the instant case does not fall under the Adams rubric, but rather under that developed in Carl and its progeny.

The court in Carl recognized a new exception to the at-will doctrine, different from that established in Adams, and to be analyzed differently.  See Wallace v. Skadden, Arps, Slate, Meagher & Flom, et al., 715 A.2d 873, 886 (D.C. 1998) (analyzing complaint first under Adams and then under Carl and holding, *inter alia*, that the complaint failed under Carl because plaintiff "was not terminated solely, or even substantially, for engaging in [protected] conduct").

---

[2] While it is undisputed that Plaintiff engaged in a protected activity in cooperating with the OIG and that Amtrak took an adverse personnel action against Plaintiff in terminating him, Plaintiff's claim fails the third requirement.

Where the plaintiff is seeking to establish an exception under <u>Carl</u>, the sole reason element may be weakened. See <u>Wallace</u>, 715 A.2d at 886 n.25 (noting that in <u>Carl</u>, the court upheld a complaint alleging that plaintiff was discharged for two discrete reasons, only one of which implicated a public policy exception); <u>see also</u>, <u>Taylor</u>, 109 F. Supp. 2d at 15 n.6 ("the Court is doubtful that plaintiff was demoted solely, <u>or even substantially</u>, for engaging in alleged whistleblowing activity") (emphasis added) (citing <u>Wallace</u>, 715 A.2d at 886).  Nonetheless, Plaintiff must at least establish that retaliation was a substantial reason for his termination. Plaintiff has failed to do so.

It is undisputed that the actual cause for Plaintiff's termination was that he fell into the bottom ten percent of employees in the 1999 performance evaluation.  In order to succeed on his claim, Plaintiff must show that the score that placed him at the bottom of the rankings was at least substantially caused by retaliation on the part of Mr. Weller.  For the following reasons, no reasonable jury could so find.

First, Plaintiff was terminated along with 150 other employees as part of a company-wide performance review implemented by an outside consulting firm.  He was terminated because the evaluation of his performance placed him in the bottom ten percent of employees.  Plaintiff cannot dispute that were the evaluation performed fairly, he would have been properly terminated having fallen into the bottom ten percent.  He also must concede that his position in the bottom ten percent was impacted not only by Mr. Weller's review, but also by the ratings of hundreds of other employees who were evaluated by supervisors other than Mr. Weller.  This is so because Plaintiff's discharge was based on his score relative to the other employees.  Plaintiff's ranking was not controlled entirely by Mr. Weller's score.

Second, there is no evidence that Plaintiff received unfair scores from Mr. Weller. It is undisputed that the rating Mr. Weller gave Plaintiff in the 1999 evaluation was consistent with ratings Plaintiff had received over the preceding seven years, and Plaintiff does not claim that his ratings in prior years were tainted.

Finally, Plaintiff's allegation that Mr. Weller purposefully gave Plaintiff scores that he knew would be low enough to result in Plaintiff's termination is entirely speculative and without support. Plaintiff has not contradicted the declaration of Joseph M. Bress, Amtrak's Corporate Vice-President of Labor Relations, which describes the difficulty a supervisor would have had in attempting to ensure that a particular employee fell into the bottom ten percent:

> Throughout the process, PDI assured me that it would be difficult for a supervisor to "pre-select" an employee for termination unless the supervisor gave the employee an overall functional evaluation score of 1 or 2. To "pre-select" an employee for termination, a supervisor would have to know the scores that were being assigned to other employees by their supervisors, would have to be able to mathematically navigate the weightings/ratings calculus including adjusting the combined weightings from 120% to 100%, and would have to have knowledge of where the employee would have fallen in the final ratings. A supervisor would have to bet that the multi-rater scores likewise would be low enough to ensure that the employee fell into the bottom ten percent.

Def.'s Ex. 1 ¶ 15.

The only evidence Plaintiff provides in support of his contention that Mr. Weller had the ability to "pre-select" Plaintiff for termination is that (1) Mr. Weller knew that his supervisor score made up a significant percentage (65%) of Plaintiff's overall score; (2) the scores Plaintiff received from Mr. Weller differed from those he received from himself and his co-workers; and (3) Mr. Ellis, Mr. Weller's supervisor, had interfered with the scores another employee had received from her supervisor. None of this evidence demonstrates how Mr. Weller could have

11

manipulated the evaluation system to cause Plaintiff to fall into the bottom ten percent of employees.

While Mr. Weller knew that his supervisor score made up a significant percentage of Plaintiff's overall score, Plaintiff fails to demonstrate that Mr. Weller knew what ratings Plaintiff was receiving from his peers, which made up Plaintiff's "multi-rater score," nor that he was aware of the ratings other employees were receiving from their own supervisors and co-workers. Without that information, Mr. Weller could not have predicted a score that would be sure to place Plaintiff in the bottom of the rankings relative to his peers, short of giving him a score of one or two. Plaintiff contends that Mr. Weller did not need to go through the scores of all 272 employees in Plaintiff's business unit, arguing that "[a]ll he had to do, was give [Mastrangelo] exceptionally low scores." Opp'n at 19. It is undisputed, however, that Mr. Weller did not in fact give Plaintiff an obviously dooming score, but rather scored him in the "competent" range with a 3.64 rating. A rating which, as discussed earlier, was consistent with the previous ratings Plaintiff had received from his supervisors over the years.

Plaintiff argues that Mr. Weller's score differed from those given to him by his peers, however, Plaintiff's own self-rating fell below nearly half of the ratings given to him by his peers. PDI Performance Index Rater Questionnaires for Anthony Mastrangelo (Def. Ex. 17). Further, it is the supervisor's perception of the employee that is relevant, not the perceptions of his coworkers. Cf. Smith v. Chamber of Commerce of U.S., 645 F. Supp. 604, 608 (D.D.C. 1986) (in a claim of discrimination under the Age Discrimination in Employment Act, only the perception of the decision-maker is relevant in establishing that discrimination was a determining factor in the employment decision).

Finally, the fact that Mr. Weller's supervisor had intervened with the scores Mr. Weller had given to another employee has no relevance to Plaintiff's case. It is undisputed that Mr. Ellis approved Mr. Weller's evaluation of Plaintiff without change. Because Plaintiff has presented no evidence that Plaintiff's supervisor even had the ability to "pre-select" Plaintiff for termination, let alone that he did so, Plaintiff has failed to create a genuine issue of fact as to causation. Because no reasonable jury could find that retaliation was at least a substantial cause for Plaintiff's termination, summary judgment in Amtrak's favor is appropriate.

### III.  CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted. An appropriate order will accompany this Memorandum Opinion.

February 22, 2006

/s/
Thomas F. Hogan
Chief Judge